My name is Rowena Dizon. I represent Margarita and Augustine Gaeta as guardians ad litem for the minor A.G. May it please the court, we're here because the district court granted summary judgment based on a finding of preemption of the plaintiff's failure to warrant claims based on state law. What happened was the minor underwent minor surgery to move two moles from his back and the anesthesiologist administered an anesthetic called halothane that's still approved by the FDA. It's available during the surgery. That drug has a known adverse effect on the liver. The surgeon prescribed ibuprofen 400 milligrams as a prescription dosage for pain. And the mother bought an over-the-counter ibuprofen at 200 milligrams and administered two pills to the boy at as directed. And within a few days, the boy started to develop symptoms of acute liver failure. The doctors didn't know what it was. The surgeon that had prescribed the ibuprofen. I think we know all those facts, Ms. Dizon. Let's assume that that's what caused his harm and go from there. For our purposes today, that is. I do have only 15 minutes. And before I forget, I would like to reserve about 15 minutes of my time for rebuttal. The problem here is that the Perrigo is the generic manufacturer. It's claiming that their hands are tied, that they cannot ever change the warning of the ibuprofen drug because it's not the brand-name manufacturer. Well, since the district court ruling refusing to apply Wyeth v. Levine, there have now been two circuit courts that have held that the Hatch-Waxman amendments to the Federal to the Food, Drug, and Cosmetic Act actually allows the manufacturer to use several methods to change the label. Number one, and has been widely disputed in this case and in other cases, is whether or not the manufacturer, the generic manufacturer, can unilaterally change the label. The Mensing case, which is in the Eighth Circuit, decided that it's not even necessary to decide for a preemption analysis that you can, whether or not you can make a unilateral change under what's called a CEE supplement, which is a supplemental application that one can file with the FDA and where you can make the change to the label before FDA approval. The Mensing case said, well, we don't need to decide that the manufacturer can make unilateral changes to the label because it can always contact the FDA. They can always make a file what's called a prior approval supplement. The language of the regulations clearly allow and authorize them to do that. So on the other hand ---- Roberts, assuming for the moment that, let me ask you two things. One, assuming for the moment they could not do anything, do you lose them? Assume for a moment that the generic manufacturers could not change the label? Couldn't make any changes. Is your case over then? In a situation where you'll have a drug that, where there's mounting evidence of a causal association with an adverse event. I'm assuming that. Right. The manufacturer always has the option to stop selling the drug, the generic. There's no law that requires them to stop selling. No, but I ask, is your case over? That was my question. Is it then preempted, assuming they can't do anything? Assuming that for the moment, they can't do anything, is your case over? Well, assuming that they can't do anything, is the claim preempted? Well, no. Could they do the dear doctor letter if they can't change? Even if they can't change the label, can they send out the dear doctor letter? Yes. The circuits have, the circuits have, the Eighth Circuit and the Fifth Circuit did say that they can ask the FDA to issue a dear doctor letter, that they could. So that means they'd have to go to the FDA to do it, right? Yes. So let's just, assuming then that they know that this is dangerous, is going to cause a problem, and today they send, they send something to the FDA that says, I would like you to issue a dear doctor letter, but they haven't issued it yet. But they haven't issued it yet. The FDA hasn't issued it yet. Well, I think that Then can they go on selling the drug? I think it was the DeMahie case that pointed out that issue, whether or not you can sue a manufacturer who has taken some sort of step to try and warn the consumer, either by starting a process with the FDA under any method, or perhaps even I would suggest that they contact a brand name manufacturer and say, you know, are you paying attention to these studies? If there was evidence in the state court, in any case, including ours, that they made some sort of effort because they have this knowledge that this drug has a causal association to an adverse event like acute liver failure, then a jury could find that there's no liability because they didn't discharge their duty. The FDA regulations impose on generic manufacturers equally as with brand name manufacturers the duty to report, to collect reports, and to report it to the FDA. Now, you said assuming they have the knowledge. Is there a should have? Assuming they don't have the knowledge, but you think they ought to have had the knowledge, are you then, as a tenor, are you finished? Well, I think on a, on a, on a, on a, I don't think that there's ever, I don't think that we can assume that this, that the case, cases like this are preempted. I think what we're talking about is if you go to trial and you've got, you've got no evidence that the manufacturer knew, then the question becomes. So should have known? Well, see, our problem with that, Your Honor, is that they should have known because of the postmortem obligation. I understand what you just said, so I'm asking you. When, when you, when you, when you state it, you say had the knowledge. And if I recall even instructions to juries and things, there is a distinction between knew and should have known. Right. That's kind of, you know, a negligence standard. You should have known, but you didn't. You shouldn't. So I'm asking you, are you saying is it no or is it no or should have known? In your view, just ask me. It's both. Even in a, yes, even in a, in the KC instructions, because this is a State claim, the California-approved instructions would, would be used. The failure to warn under strict liability actually uses that same language, because they should have known based on the available scientific literature. And the facts of our case, we have, what we intend to show the jury is that there were literature published, published starting from the 70s, continuing through the 2000s that show, you know, mounting evidence of acute liver failure. We have the treating surgeon as well as the pediatrician testifying that they didn't know because they weren't told by the manufacturers in the label. And we're saying that Perrigo, as a manufacturer of this drug, should have known, knew or should have known that the drug causes acute liver failure. There is in the record, in I think it's Exhibit C, it was the excerpts from the deposition of Dr. Zeller. He is the. Kennedy. Ms. Dazon, just, I'm wondering, is that before us? The question, I think, was really preemption, isn't it? And if we were to say there is no preemption, the state may proceed with its case or you may proceed under state law to try to get what you recover you can. Then it seems to me at that point you would then start arguing about whether anybody knew or should have known or whatever. But I don't think we're there yet, are we? Exactly. I agree, Your Honor. The evidence will be presented to the jury once we get there. The question now is in terms of preemption, a purely legal one. So. That's a step down the road. Maybe it's step two. I don't know. But the first step is to determine whether preemption applies, I think. I think that's what the district court decided. Right. And that's what we need to decide. Right. And if we decide it in your favor and remand, then you're going to have to prove these other elements as part of your case, I think. Exactly, Your Honor. Judge Fernandez asked you to assume that the defendant couldn't do anything at the FBI. That was his – he asked you just to assume that for the sake of discussion. That's not your position, though. Your position is that there were things that Parego could do. Is that right? Exactly, Your Honor. Can you tell us in 25 words or less what could they have done? Contact the FDA. There is nothing inconsistent with a State law duty, imposed duty. And how do they do that? With one of these CVE? Well, they could do it many ways. There's nothing in the regulations that even says they should just use a CVE. They're authorized to do it. What we're saying is they've got many options. So they could have contacted the FDA? Contact the FDA. Write a letter. There's nothing in the Act or the regulations that prevents them from inquiring, even with the FDA, can we do this? The point is that the – Independent of that, could they add or strengthen their warnings? I mean, just on their own? We're talking – what you're describing is the CVE process on their own, filing this CVE supplemental application where, once it's filed, they can actually make an addition to the label and then put that in the market. And then the FDA is supposed to act expeditiously on the CVE and tell the manufacturer we don't agree or we agree. And then they are supposed to revise the label back if it's not approved. Can they change the label without FDA approval? That's a CVE process, a CVE supplemental? So the answer is no. They have to get FDA approval? No. The answer is yes, that they can use the CVE process. 314 – 21 CFR 314.97 is the regulation that explicitly, expressly on its language says, and the holders, the generic manufacturers shall comply with the provisions of 21 CFR 314. I'm not making my question clear. Do they have to wait for the FDA to pass upon the CVE application? No. That's the point, isn't it, of that application? Right. There's two. There's two. There's the prior approval where they have to wait for the FDA approval. And then there's a CVE supplement where they can change the label right now pending approval of the FDA. Gotcha. Right. And then there are the letters to the doctor. And then there's a dear doctor letter that they could ask the FDA. Those are three things they can do with one. The first one is with FDA approval. The second two they can just do on, well, they, I guess they have to ask FDA for letters to the doctor. Yes. In all instances, the FDA ultimately still has to approve the label. The question is what the manufacturers should act at some point when they get information. And the, I just also want to point out, it's, there's a federal register in 57 FR 17950 comment 40. That was the commentary of the FDA when they implemented these regulations in 1992 under the Hatch-Waxman Amendment. In the comments, in the comments, the FDA's comment, they basically said, and the holders should come to us if they think that there's something that should be revised in the label. So that's another way, I'm saying that just to add to the list of three we were talking about. Because under any circumstance, they can always talk to the FDA. We think that there's something that should be done here. Now, and then ultimately, if the evidence shows it, you go to the jury and they can have their defense. The point is that the manufacturer, the generic manufacturer should not be allowed, in fairness, to, you know, keep marketing a drug that they know has inadequate warnings. An inadequate warning is, makes a drug unsafe. And it leads to an unfair result. And I see my time is almost up. And I just wanted to. You've got about a minute and 20 seconds left if you wanted to reserve it. Yes. Just, just, okay. Preemption creates arbitrary results. You can have a situation where the brand name manufacturer stops selling the brand name drug. Now what do you do? The generic manufacturer is the only one that's manufacturing the drug out there and the label still has to be maintained. There should be no preemption because it deprives the consumer of a remedy. And all depending on whether or not the consumer buys a generic version of the drug rather than a prescription. And with that, I'll sit down. Thank you. Good morning, Your Honors. Good morning. Michael Healy on behalf of Appellee Parago Company. First of all, one thing that is clear here is Parago had to, the plaintiffs concede, had to originally have a label that was the same as the brand name company or the innovator or pioneer. I'll call them brand name companies. That's the original company that gets approval. So on day one, there's no ambiguity. It had to be the exact same. And in order to get generic drugs on the market, the legislature of the United States decided we are not going to require the testing, human testing, animal testing, clinical testing, that they require for the brand name drug. Is it true that your client could have changed the label without prior FDA approval and then have gotten approval after the fact using the CBE process? That is not true, Your Honor. There is nothing in any statute of regulation that permits a generic to deviate from the labeling of the brand name company. Let me tell you why that's important. Particularly in this case, it's over-the-counter drugs. So there is often no doctor in between. It's even more important that it be identical. Otherwise, if there's two separate warnings, and there can be eight separate warnings of eight separate generic drug companies, it's going to lead to confusion. The person is going to look at it, and if I have, let's say Parago decided to put a stronger warning and all the generics did, the drug wouldn't be used. No, I want to make sure I'm clear. I understood counsel to say that they can change the label and then go get permission after the fact under the CBE procedure. She's referring to a brand name prescription drug. She's not – I think she's mistaken. That is not the law as it concerns a generic drug like mine. Consistency is essential. There's nothing – why is it required to be the same on day one? I mean, the reason to have the same on day one never changes on day two, three, four, and five. And remember, a generic drug company in the Hatch-Wackman Act pushed the generics to come on the market to lower the price of drugs. And how did they do it? They didn't do the testing for $100 million and $200 million it requires to be brought to market in order to have a lower price. So what the plaintiffs are suggesting here is – and, well, really, when we say knew or should have known, what we're saying is should have known you have to do all the testings that the brand name drug company does. You have to do yourself. Even though we just told you you don't have to do it in order to come to the market, as long as the drug's the same, meaning it's the bioequivalent, and the warning's the same, it'll let you come to the market. But the plaintiffs are really saying, no, no, no, you could have done the testing, Mr. Healy. You didn't because you're a generic, but you've got to pay the price for it. That would frustrate the whole purpose of the Act. Let me test the limit of what you're saying. All right. I don't know what your answer will be, but let me test it. Let's say your company just happens to have a brilliant doctor, scientist working for them. Let's call him Dr. Asclepius, smartest doctor you could ever think of, right? He discovers that this drug, this generic drug, which meets all the FDA stuff, will cause horrible physical effects on a substantial part of the population if it's sold. Okay? He knows this. All right. Is it your position, Ms. Gwynne, is it your position that your company can go on selling this drug, knowing that it will be used by part of the substantial part of the population, with perhaps the duty to let the FDA know at some point that this would happen? But they let him know. But while that's going on for the next six years while the FDA convenes its committees and does all the whatever it does, now, remember, we've got to find who your doctor is. So there's no question that this is what's going to happen. And your position is, I think, that without risking liability anywhere, you can just go on selling this stuff. Is that right? Well, that oversimplifies my response. But in terms of is it preempted, the answer is yes. But is there duties under the FDA, meaning if I did a study, I have an obligation to report that to the FDA. Correct. And the FDA would have that under consideration. And the FDA, under your circumstance, since it's arguably proven, would instruct the brand-name company to change their label, which my client would then have an absolute obligation to modify its label. I'm not going there at all. I'm just saying the fact that your company knows, knows.  I'm just saying that the FDA, as I remember I'm saying, really knows because Asclepius is so good that they know. So they know that they can keep selling it and there's no consequence. Right? Because it's preempted. I'm not saying they don't make a report to the FDA. Well, yes, because there can be consequences to the FDA if one doesn't report it. Excuse me? There are consequences for your failure to report that study. No, they reported it to the FDA. Oh, they reported it to the FDA and the FDA considered it and decided to take no action? It hasn't done it yet. It hasn't done anything yet. They've just reported it. How long does it take for the FDA to consider and take action? Maybe it takes 10 days. Maybe it takes 10 years. Maybe it takes 10 months. It typically depends on the integrity and the information you're providing. Sure. But I'm telling you, and everybody's going to recognize, this is the greatest guy. Okay. He's the greatest guy since the Greek times, right? No, I understand. He's terrific. All I'm saying, I'm trying to test the limit of it. It's reported to the FDA, and meanwhile, your company with knowledge can just go on selling it and there's no consequence. Is that right? That's your position. We reported it to the entity whose responsibility is the Federal Government has designated to be in charge of labeling. So this entity with independent sciences, so we may have the smartest guy in the world, and you may be wrong. So anyway, the smartest guy under your hypothetical delivers the information to the FDA. The FDA has it, considers it, and decides not to make a labeling change. I would argue under those circumstances, it would be misbranding twofold. One, a generic can't have a different label, and it is misbranding. And what the plaintiffs say in their brief is, Mr. Healy, cite me a case where a generic changed the label and it's misbranding. Let me tell you why it doesn't happen. I advise generic companies, as do a whole lot of the lawyers, they make sure their warning's identical. That's why there's not an example of it, because they know what the law is. Every generic complies with the brand name label. But let me push your Honor's hypothetical a little bit further. Say Dr. Jones said, I think you ought to have a warning about hepatotoxicity, which is toxicity of the liver. Well, first of all, that warning wouldn't be accepted because over-the-counter labelings have to be simplified and for people of low comprehension. There's no person in the world who's going to know what hepatotoxin means. That's not going to be any help. That's not going to be helpful. So in this case, the plaintiffs, they go farther. And they're going to want every, so whatever a plaintiff's lawyer thinks of, he's going to say, Mr. Healy, you didn't submit it to the FDA and get it rejected. So in this case, they go farther. Not only is hepatotoxin, but this hepatotoxin, when taken concomitantly with other hepatotoxins, is, you know, an evil drug, and therefore you should warn about it. Well, who's going to put that on a label to simple laypeople that if you take one hepatotoxin concomitantly with another hepatotoxin, that that's it? And looking at the Cantor case, which is a California case, I couldn't. Why wouldn't the label say it could cause liver damage if you've taken, if you've had anesthesia? Because under their scenario, Your Honor, I couldn't get preemption defense here. And more importantly, the FDA in 2002, we want to know what they did. The FDA considered in 2002 in the Federal Register 541939 and following whether or not they should have a liver warning in this exact drug, ibuprofen. They decided not to. So what Your Honor, I guess, is saying, when they considered all the medical evidence in 2002, made a decision not to put it on, that somehow had a different duty in 2004, even though our client didn't receive a single report of a liver injury.         It's a different drug. And so I don't think there's an obligation. Maybe you went on the merits but not on preemption. Well, I think I should have went on preemption out of those guys. Let me ask you this. I asked you before whether you can change the label and then get approval after the fact. If you... I already asked you that. Yes, sir. ...please consider instructing the brand name company to modify their warning and we will come up with a duplicate warning. I'm not precluded from doing that. Never suggested I am. Well, if you can do that and if you didn't do it, why would that kind of claim be preempted? What do you mean if I didn't do what? If you didn't go through the procedure you just described. Well, in this case, I knew the FDA considered the issue in 2002. So am I supposed to do it every day, keep resubmitting it? Or am I to say the scientific body considered the relevant evidence on point and made a well-informed decision with scientists that no, there's not a justification and that's a reasonable basis for this. A reasonable basis to add that warning to the label. And more importantly, as Your Honor knows, certain reactions are dose dependent. The FDA at the same time my drug is being made, the generic over-the-counter drug, also is approving the labels for a prescription drug, the 400 milligram drug. So mine, you just go to the pharmacy and grab it off the shelf of a local drug store. Other one, you have to go to a doctor. This particular patient got both. But more importantly, the FDA's label for the 400 milligrams, for ibuprofen, had a liver warning in it. So you can't, no one can suggest in good faith that the FDA was not aware of the controversy about liver. In His Honor's hypothetical, I had the only smart guy in the world. But in real life, in this case, they considered the issue, made an informed decision to have it on the prescription dose, the 400 milligram dose, but to not, N.O.T. not, and they still don't today, have it on the over-the-counter dose. And that is to encourage a low-level, inexpensive pain medication to be readily available to the public. Do I understand correctly two circuit courts have dealt with this issue and haven't seen sure way? Two circuit courts in the search. There's a circuit in the Supreme Court, and they've been asked to be briefed by the Solicitor General. And then the Sixth Circuit in Morris asked the FDA to brief it. So those certs are pending. So we are awaiting the brief from the Solicitor General. And obviously, I'm not privy to what that brief would say. So perhaps the Supreme Court is going to show us the answer? Maybe. They might. But I think we should, given the correct answer, head. That would be my position. But I think you're right, Your Honor. I think we will see something, but you would have a better estimate of me of how quick they will reach a decision. But I think we need to think is, what is it a jury would be asked to decide in this case to show you the dangers if an individual jury decides? Your Honor sort of suggests this. Well, if you said something on liver warning, that might give me preemption. Plaintiffs in this case argue, Mr. Healy, if you just had liver, it's not enough. You have to say it damages the liver, and it's worse, and they use the word concomitantly, which would mean together, with another hepatic toxic or liver toxic drug. That's the warning you must have. So under their argument, if I submitted and said, please put a liver warning and ibuprofen, and they tell me, no, Mr. Healy, but I did not submit a letter or CBE or some other communication to the FDA saying, please make sure it says it's hepatic toxic and it's more dangerous when used concomitantly with another hepatic toxin, they would argue under their scenario, I would be in front of a jury down in Judge Ware's courtroom deciding that issue. So whatever plaintiff's lawyer could pay an expert to say how my warning should be a little bit different, I would never have preemption protection unless the guy admitted, well, I want you to have exactly what you submitted, which is impractical. That's not going to happen. The – so I think this – the trial court made the correct conclusion, obviously. But more importantly, it made several important findings. One, that the FDA did consider this issue. Two, it made a decision not to require the label. So in order to not give me preemption, we're going to have to say, well, Mr. Healy, although there is no Dr. X's study that you hid or failed to report, that we are going to require you, regardless of the FDA's consideration and rejection of a liver warning on the drug, we're going to require you to have one. Now, I would say, well, that is – there's nothing – no one cites anything that would not be misbranded. Would you say they would have an action if you knew that and did not tell the FDA? Excuse me, I missed that, Your Honor. Would you say they would have a cause of action if you knew the problem and did not tell the FDA? No. The FDA would have a – under PUCMA would have a claim, which they have brought many times. I mean, people are facetious. They say, oh, that's not going to happen. He said no. Yes. They would not have an action. They would not. In this particular case, and one of the questions you asked, did anything survive, that's what Judge Ware asked. We had a hearing post the entry of the summary judgment, and they never proffered any cause of action that would survive my preemption motion. Okay. Now, if you look at this case, it's a case of mismanufacturing. One could concoct a financial scenario potentially, but it's certainly not in this case. But the other thing you could have is, Your Honor, it happens. Believe me, I've had clients who did. It does get mismanufactured. People have the wrong warnings. That happens. I have clients that it's happened to. Your time is up. Thank you, Your Honor. Thank you very much, Mr. Healy. I think you had about 40 seconds left or so. Thank you, Your Honor. I just want to make a quick point that, as addressed in my reply brief, what counsel just said about the 2002 liver warnings is factually incorrect. It related to acetaminophen, not ibuprofen. The fact that the FDA did change the label to the prescription shows us that the FDA would have accepted a change had Perrigo requested it. The evidence is that Perrigo never requested any liver warning. The ‑‑ and if you look at the ‑‑ the evidence was not before the district court as far as why the prescription label ended up having a liver warning, but the fact is that the ‑‑ there was no denial of a request to add a liver warning. And the fact that AG's product did not have a liver warning makes the ‑‑ made the product defective. May I make one more point, Your Honor? Quickly. The cause of action ultimately is handled through a foreseeability analysis. If you've got an OTC manufacturer of ibuprofen knowing that there are these adverse risks for liver and they know that the product can be prescribed and it's available in a prescription form, they should contact the FDA and say that the liver warning should be on there because it's foreseeable that a consumer would buy the OTC product. And a doctor who prescribes the drug, relying on a label that's defective because it didn't have a liver warning, leads to injury. And so thank you very much. Thank you very much. And thanks, Ms. Healy, as well. The case just argued is a substantive assessment. Thank you. All rise.
judges: Thompson, Fernandez, Silverman